2022 IL App (2d) 210547-U
No. 2-21-0547
Order filed February 28, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re Parentage of T.T.*, a Minor | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| | ) | |
| | ) | No. 19-FA-230 |
| | ) | |
| | ) | Honorable |
| (Francesco P. Anguilo, Petitioner-Appellee | ) | Justin M. Hansen, |
| v. Natasha T., Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices McLaren and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the trial court's decision to grant the father significant decision-making authority and the majority of the parenting time as to the parties' minor child.  We also affirm its decision to restrict the mother's parenting time.  Affirmed.

¶ 2    On July 19, 2021, the trial court conducted a five-day hearing to allocate parental responsibilities between petitioner-appellee, Francesco P. Anguilo, and respondent-appellant, Natasha T., as to their daughter, T.T. (born in 2019), pursuant to sections 602.5 (750 ILCS 5/602.5 (West 2020)) (decision making) and 602.7 (750 ILCS 5/602.7 (West 2020)) (parenting time) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/101 *et seq*.) (West 2020)). The court granted Francesco significant decision-making authority and the majority of the

parenting time. It also restricted Natasha's parenting time pursuant to section 603.10 of the Act (750 ILCS 5/603.10 (West 2020)), requiring her visits to be supervised.[1] Natasha, *pro se*, appeals each of these rulings, arguing that they were against the manifest weight of the evidence. Francesco, represented by counsel, initially filed a "response brief" that was effectively a motion to strike and dismiss. We denied the motion to strike and dismiss, explaining that Natasha's lack of compliance with Illinois Supreme Court Rule 341(h) (eff. Oct. 1, 2020) did not preclude our review of the issues raised. We extended the briefing schedule, ordering Francesco to file a response brief and allowing Natasha time to reply. The extension of the briefing schedule provides good cause for issuing our decision beyond 150 days after the notice of appeal was filed. See Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). For the reasons that follow, we affirm.

¶ 3                                     I. BACKGROUND

¶ 4      In 2019, Natasha gave birth to a daughter, T.T. When Natasha informed Francesco that she had given birth to T.T., Natasha and Francesco decided to live together in McHenry County. Francesco worked outside the home and performed approximately 10% of the domestic and child-care-related responsibilities. Natasha did not work outside the home and performed approximately 90% of the domestic and child-care-related responsibilities. This arrangement lasted several months but, as the child representative would later report, Natasha and Francesco's relationship was "toxic" and they "brought out the worst in each other."

¶ 5                               A. Pre-Trial Proceedings

---

[1] The trial court also granted Francesco's essentially uncontested petition to establish paternity. This is not an issue on appeal.

¶ 6     On October 11, 2019, Francesco filed a petition for allocation of parental responsibilities as well as an emergency petition to restrain Natasha from removing T.T. to Florida. (The petition for allocation of parental responsibilities, in its amended form, would remain pending up until the trial court issued the instant appealed-from order.) On November 7, 2019, however, the parties entered an agreed order allowing Natasha to remove T.T. to Florida. The agreed order also prohibited the parties from making derogatory comments to one another and reserved the issues of Francesco's parenting time and child support.

¶ 7     On September 15, 2020, Francesco filed an emergency petition for temporary possession of T.T. He alleged that Natasha had been concealing T.T. and that T.T. was in danger. He explained that, in November 2019, he had agreed that Natasha could move to Florida with T.T., because he believed that Natasha's "mental health" was "stable." Since then, however, he believed Natasha to have resided in Florida just one week before moving to Las Vegas, New York, and Chicago. He also believed that, while in Chicago, Natasha resided with an exotic dancer with a known substance-abuse problem. Moreover, he pleaded:

"21. Francesco believes that Natasha is conducting *** pornographic conduct in and/or around the presence of the child.

22. Natasha traveled to Chicago to engage in prostitution.

***

24. *** Natasha has a long history of prostitution. In fact, Natasha was a named [p]laintiff in a highly publicized Eastern District of New York Case ***

***

26. Natasha's destructive behavior is endangering the physical and emotional well-being of the minor child and she should not be granted parenting time at this juncture."

¶ 8     Francesco attached images of text messages wherein Natasha refused to disclose T.T.'s location.  He also attached a print-out from the pornography webpage that Natasha maintained, with one posting appearing to solicit sexual activity in that it asked, "Wanna be my date tonight?"  In addition, he provided a citation to the pending New York case, wherein Natasha adopted a pseudonym to protect her identity.  In that case, the background provided that Natasha accepted certain lifestyle benefits arguably in exchange for a sexual relationship.

¶ 9     On September 16, 2020, the trial court granted the emergency petition.  It cited to the allegation that Natasha concealed T.T. and did not discuss the allegation that Natasha participated in illicit activity.  It ordered Natasha to appear in person with T.T. on September 23, 2020.  Natasha did not appear, and the trial court continued its order to September 30, 2020.  On September 29, 2020, Natasha filed an appearance through counsel.  However, she did not appear in person as ordered and she did not turn over T.T.

¶ 10    Consequently, on October 19, 2020, Francesco petitioned for a finding of indirect civil contempt.  On October 21, 2020, Natasha responded.  She agreed that she stayed in Las Vegas instead of Florida, but she alleged that Francesco knew where she was.  In support, she noted that Francesco bought her plane tickets to travel from Las Vegas to Illinois in another attempt to live together.  They lived together from December 14, 2019, to February 28, 2020, at which time Natasha left due to alleged abuse by Francesco.  Natasha moved in with a friend in Chicago, who was a bartender, not an exotic dancer, and who did not, as Francesco had alleged, have a substance-abuse problem.  Further, to the extent that Natasha concealed T.T., it was to protect her and T.T. from Francesco's abuse.  Natasha informed the court that, while it had ordered her to return T.T. to Illinois, a Florida order of protection against Francesco named both Natasha and T.T. as protected parties.

¶ 11    On October 22, 2020, after a hearing on Francesco's contempt petition at which Natasha's counsel was present, the trial court entered an order that would allow Francesco to seek the help of Florida law enforcement in obtaining possession of T.T.  On October 28, 2020, Francesco obtained possession of T.T. with the help of Florida law enforcement.  On November 19, 2020, Natasha petitioned for a restoration of her parenting time.

¶ 12    On November 20, 2020, the trial court stayed all proceedings pending a conference pursuant to the Uniform Child-Custody Jurisdiction and Enforcement Act (UCCJEA) (750 ILCS 36/101 *et seq*. (West 2020)), which it held December 4, 2020.  There, the court conferred with the Florida judge who presided over the order of protection pending in Florida.  It was decided that the Illinois courts would maintain jurisdiction over all child custody issues and the Florida courts would retain jurisdiction over the order of protection.

¶ 13    On December 9, 2020, it being established that the Illinois courts would have jurisdiction over all child custody issues, the parties resolved Natasha's petition for a restoration of her parenting time through an agreed order.  The order provided that Natasha would have weekly, supervised parenting time.

¶ 14    On December 18, 2020, despite the agreed order, Natasha again petitioned for the restoration of her parenting time, this time seeking that Francesco submit to a substance-abuse evaluation.  On December 30, 2020, the parties resolved the question of Natasha's parenting time through another agreed order, which again provided that Natasha would have weekly, supervised parenting time and added that Natasha would have daily FaceTime or Zoom calls.  On the question of Francesco's drug use, it appears from the record that Francesco submitted to a drug test, tested positive for cocaine, and proceeded to participate in and comply with a drug-treatment program.

¶ 15    On January 12, 2021, the trial court granted Natasha's attorney leave to withdraw. On February 22, 2021, Natasha, *pro se*, again petitioned for a restoration of her parenting time. On February 23, 2021, new counsel entered an appearance and adopted the motion. The court set the matter for briefing.

¶ 16    Meanwhile, on March 12, 2021, Natasha moved to enroll the Florida order of protection in Illinois. The trial court entertained the motion at hearing, at which both Francesco and Natasha were present and represented by counsel. Natasha argued that the order of protection was necessary, because she still feared Francesco, and she would be traveling to Illinois to visit T.T. Francesco objected, arguing that enrolling the Florida order of protection in Illinois could create confusion, because it named T.T. as a protected party and, per the Illinois order, Francesco had possession of T.T. The trial court enrolled the order of protection over Francesco's objection but specifically admonished that Francesco was to retain possession of T.T. and that any contrary provisions in the Florida order of protection would not be enforced.

¶ 17    On March 16, 2021, in express violation of the trial court's order, Natasha e-mailed the McHenry County Sheriff and sought to have the Florida order of protection against Francesco enforced as to T.T. Law enforcement, including SWAT units, arrived at Francesco's home and attempted to remove T.T. Francesco's counsel and the child representative intervened to explain that the Illinois order controlled the issue of custody. The parties reconvened before the trial court later that day to discuss the matter. Natasha's attorney averred that Natasha had acted on her own and she, the attorney, was just as surprised as anyone else. The court was "very concerned" that the events of the day had occurred despite its assurances to Francesco that the Florida order of protection could not be used to remove T.T. from his care. The court admonished Natasha that

"any further attempt to enforce the Florida order of protection as it relates to [T.T.] will find somebody in contempt of court. I will put you in jail."

¶ 18    On March 18, 2021, Natasha amended her petition for restoration of child custody, requesting an allocation of parental responsibilities. The trial court set a hearing date of July 19, 2021, at which time it would hear each party's petition for allocation of parental responsibilities.

¶ 19                    B. Pre-Trial Report by the Child Representative

¶ 20    In May 2021, the child representative submitted a pre-trial report. The representative addressed each party's home environment. Natasha lives in a two-bedroom apartment in Miami. T.T. sleeps in a crib in Natasha's bedroom. Natasha's 11-year-old son, over whom she has shared custody, sleeps in the second bedroom. Francesco works from home and is able to provide steady childcare. His girlfriend helps with childcare; she willingly took a hair follicle drug test, which came back negative. While living in Francesco's home, T.T. also interacts with her step-siblings and her paternal grandmother, who visits.

¶ 21    The representative then summarized the parties' respective concerns. Natasha was concerned that Francesco "uses drugs and has significant issues with domestic violence." Francesco, in turn, was concerned that Natasha "engag[es] in pornography, drinks and parties to excess, continues to make false allegations and reports of domestic violence against him, and [would conceal T.T. in] Florida." The representative investigated each of these concerns by reviewing police reports, court pleadings, Francesco's drug evaluation and progress report, and text messages between the parties; interviewing the parties, Natasha's ex-husband, two of Natasha's friends, Francesco's ex-wife, Francesco's neighbor, and the McHenry County Sheriff (concerning the March 16, 2020, incident); and observing a home visit to Francesco's house

(where she met his live-in girlfriend and his children from a prior marriage, ages 10 and 12), and a FaceTime call between Natasha and T.T.

¶ 22    As to Natasha's concerns, the representative reported that Francesco did engage in drug use, testing positive for cocaine in December 2020. However, he tested negative for drugs on his most recent hair follicle test and appeared to be taking treatment seriously. The representative inferred that Francesco was not actively using drugs. Police had been called to the house for two domestic incidents between Natasha and Francesco in January and February 2020. The representative had doubts as to the severity of the incidents involving police, stating that Natasha's accounts did not "hold water." The representative noted that, although the police had been called to the scene, they did not make an arrest, and they did not report any injuries. The representative added: "Francesco has never been arrested for domestic battery. *** There have never been any allegations of abuse towards T.T. [or Francesco's] other children."

¶ 23    The representative reported that Francesco and his ex-wife communicate well and successfully coparent their two children. During their 10-year marriage, there had been no incidents of domestic violence, until the very end, when divorce was imminent. Francesco's ex-wife obtained an order of protection at that time, but she did not pursue an extension. Presently, she has no concerns about their 50/50 custody arrangement or of how Francesco's temper might affect the children. She knew that Francesco occasionally used marijuana but was not aware that he had tested positive for cocaine.

¶ 24    As to Francesco's concerns, the representative confirmed that Natasha participates in the pornography industry despite Natasha's initial denials. Natasha provided only limited information as to how her work schedule fit with her parenting schedule. However, she has been able to keep her work separate from her 11-year-old son, who thinks she is a model. Overall, "there is no

evidence at this point [that Natasha's participation in the pornography industry] somehow affects her ability to parent." The representative also confirmed that, in November 2019, Natasha did not relocate to Florida as agreed. Instead, she went to Las Vegas to live with family.

¶ 25    The child representative believed that Francesco was better able to put T.T.'s needs above his own and to facilitate a relationship with the other parent. Francesco has accommodated Natasha's requests for parenting time. He helps to keep T.T. engaged with Natasha during the 30-minute FaceTime calls, which, given that T.T. is just two years old, is "no small feat." Natasha, on the other hand, has not moved for additional parenting time in Illinois; she appears only to assert that T.T. should be returned to her in Florida. Natasha has not demonstrated an ability to coparent and, "most concerning," she has not demonstrated an ability to comply with court orders. In the fall of 2020, she failed to return T.T. to Illinois as ordered. In the spring of 2021, she attempted to remove T.T. from Illinois in violation of the court's admonishment that the Florida order of protection not be used to interfere with Francesco's possession of T.T. Natasha admitted that she contacted the sheriff's department "imploring them to protect her child from an abuser" but that she did so only because "she was so upset." Further, in the representative's view, Natasha continues to "misrepresen[t] facts to try to gain an unfair advantage." For example, she filed a claim alleging that Francesco stalked her and distributed inappropriate pictures of her in violation of the Florida order of protection, when, in fact, Francesco merely tendered his discovery responses to her, through counsel, and those responses contained photographs.

¶ 26    The representative concluded T.T. should remain in Illinois with Francesco. She believed that the risk of Natasha absconding to Florida with T.T. was "too great," and, for that reason, Natasha's visits should continue to be supervised. Should T.T. be denied all contact with Francesco, her "emotional well-being would be significantly impaired." The representative

offered that, in the future, when T.T. is "able to communicate and have an understanding of what is going on, then [Natasha's] parenting time would likely not need to be supervised."

¶ 27    On June 15, 2021, Natasha's second attorney withdrew.

¶ 28            C. The Hearing on the Petitions to Allocate Parental Responsibilities

¶ 29    On July 19, 2021, a five-day hearing on the parties' respective petitions to allocate parental responsibilities commenced. Natasha appeared *pro se*. The record on appeal contains only a small portion of the transcripts from the hearing. It contains a portion of Natasha's July 19, 2021, direct examination as an adverse witness. It also contains a portion of Natasha's July 23, 2021, cross-examination by both Francesco's counsel and the child representative. The child representative called one witness, a police officer, to impeach Natasha. Thus, the record contains only portions of Natasha's testimony, brief testimony by a police officer, and no other witness testimony. The trial court referenced numerous other witnesses in its written order,[2] and the transcripts of that witness testimony are not included in the record on appeal.

¶ 30    We summarize the available transcripts as follows. Natasha testified to her work. Since Natasha was 18, she has "worked in restaurants, night clubs in Las Vegas and—you know, in the industry, bottle service or food service." She did the same work in Chicago, as well as modeling. Presently, Natasha has been hired to work as a server at a Hilton resort in the Bahamas. A contract was still in the works. Natasha would not move to the Bahamas, but she would go there on

---

[2] The court referenced the following witnesses in its order: Francesco, Francesco's live-in girlfriend, Natasha's mental health therapist, Natasha's friend and former roommate, Natasha's sister, and Natasha's mother. Additionally, in his brief, Francesco referenced the testimony of his ex-wife, and Natasha does not dispute that she testified.

occasional long weekends (2 1/2 days of work).  She would be paid approximately $500 per trip.  In addition, Natasha has interviewed to work at a Miami nightclub.  If she got the job and T.T. lived with her, she would call upon her son's father to babysit T.T.  He and his wife have offered to do so numerous times.  Alternatively, she would hire a babysitter.  She has done that two or three times in the past.

¶ 31    Natasha also has been working in the pornography industry since February 2021.  Specifically, she "creates content" of one-on-one sexual interaction.  Once every two or three months, she hires a film photographer and engages a partner.  Natasha knows some of her partners very well.  One of her female partners was a close friend.  She knew one of her male partners for just six months.  She knew him because he shared a fitness trainer with one of her friends.  Natasha's manager puts the content from the filming sessions on her website.  The website includes Natasha's real surname, which she shares with T.T.  The filming has taken place in Natasha's apartment.  T.T. was home during those instances, but she was in another room, being watched by a babysitter.

¶ 32    Natasha's babysitter during the filming session was a good friend; they had worked as servers together at a club in Chicago.  Her babysitter also watched T.T. when she went on a girls' getaway to Aspen.  Natasha acknowledged that the babysitter recorded her conversation with the child representative, but she stated that she did not direct the babysitter to do so.

¶ 33    Natasha denied ever accepting money in exchange for sex.  Francesco's attorney attempted to impeach her by citing to the New York case.  Natasha explained that "a lot of bad things" happened to her in relation to that case and she did not feel comfortable talking about it.

¶ 34    Natasha agreed that she has allowed other adults to live with her and T.T. for weeks at a time.  She named three such persons.  One of the individuals, her hairdresser at the time, had been arrested for fraud.

¶ 35    Since T.T. had been born, Natasha had lived in Miami, Las Vegas, Woodstock, Seattle, and Chicago.  Natasha agreed that she did not always tell Francesco where T.T. was located:

"Q. Have you always told [Francesco] where his child was?

A. No, I did not.

Q. Why not?

A. One, when someone is telling me that they are going to kill me *** you know I was scared ***.

* * *

Q. There were times that [Francesco] would just calmly ask you where the child was and you would say no, correct?

A. Possibly sometimes, depend[ing] [on] what he said prior to it."

¶ 36    Natasha also agreed that her son's father testified that she withheld her son from him.  She believed it was once; opposing counsel believed it was several times.  Natasha believed that she currently had a strong coparenting relationship with her son's father.  Her son's father's testimony is not in the record, though the common law record does contain a favorable letter from the son's father.

¶ 37    Natasha testified to alleged domestic violence committed by Francesco.  Specifically, she addressed Francesco's abusive text messages.  These messages were admitted during a portion of the hearing that is not contained in the record, though at least some of these texts are contained in the common law record.  Natasha testified that, while she did not submit the entire text chain, she

did not believe the texts were misleading or out of context. Our review of the text messages that are contained in the record certainly supports the trial court's finding that the relationship between Natasha and Francesco was toxic; indeed, the texts demonstrate that Francesco at times engaged in communications that were decidedly disturbing, some of which were sent after the trial court entered an agreed order prohibiting either party from engaging in such communications.

¶ 38    Natasha testified to previous instances of physical abuse. These instances were first discussed during a portion of the hearing not contained in the record. Natasha explained that she had not called the police in these instances because she loved Francesco. "I loved the man and when you're in [a] domestic violence [situation], you don't think straight." While she did not call the police, Francesco, in at least one instance, did.

¶ 39    Natasha recounted that, in January or February of 2021, Francesco called the police. Natasha's nose was "bleeding." She assumed the officer saw it, because he asked her what happened to her nose. She then referred to the substance on her nose not as blood, but as "residue," stating that there was "like a little bit of residue on it."

¶ 40    The child representative then called the police officer who responded to the scene, Deputy Kevin McCoy. McCoy testified that Francesco had called him to the residence. Francesco informed McCoy that he and Natasha had attended a charity event. They began to argue in the car, because Francesco had been talking to another female and Natasha had been talking to another male. According to Francesco, Natasha kicked Francesco while he was trying to drive. When they arrived home, Natasha rubbed a hair comb across his face. According to Natasha, the fight had been verbal and not physical. McCoy did not see any sign of injury to Natasha. He did not recall asking her about her nose.

¶ 41    After McCoy testified, the child representative resumed questioning Natasha. Natasha testified to another physical altercation that had been addressed earlier in the proceedings. It appears from the questions posed that Natasha's mother had testified that, although Francesco had been the instigator in the altercation, Natasha nevertheless injured Francesco by cracking his tooth. Natasha denied cracking Francesco's tooth.

¶ 42    Natasha addressed a GoFundMe website that she had started to raise funds for legal fees. She has raised just over $28,000. A single person donated $25,000. Despite this, Natasha had not hired counsel for the instant proceedings. She explained that, instead, she paid $11,000 to an attorney to investigate a criminal charge against Francesco. Natasha would not go into details, but it had to do with an "investigation going on with the IRS."

¶ 43    Natasha acknowledged that she recently missed three visits with T.T. Twice, she got the dates confused. As to the third scheduled visit, she decided to visit her father in the hospital instead. However, she did not notify Francesco of the change in plans.

¶ 44    Finally, as to the events of March 16, 2021, Natasha stated: "I know it was wrong and I regret it very much." Natasha did not believe that the incident showed that she could not coparent. In her view, currently, she successfully coparented with her son's father.

¶ 45                    D. The Trial Court's Written Order

¶ 46    On August 19, 2021, the trial court entered a 17-page written order, granting Francesco significant decision-making authority and the majority of the parenting time and ordering that Natasha's parenting time be restricted. The trial court acknowledged that many of the best-interest factors left the parties on equal footing. However, based on the parties' contentious history and the physical distance between them, shared or equal allocation of parenting responsibilities was impractical. "One parent will need to have significant decision-making and the majority of the

parenting time. *Deciding which parent will have this role in [T.T.]'s life is difficult.*" (Emphasis added.) The court explained its analysis as follows. The parties' respective motions called upon it to make a decision concerning the allocation of parental responsibilities as set forth in sections 602.5 (decision making) and 602.7 (parenting time) of the Act. Many of the best-interest factors set forth in those sections overlap, including whether a section 603.10 restriction on visitation is appropriate. The court addressed each of the best-interest factors, including whether a section 603.10 restriction was appropriate.

¶ 47                                    1. Section 603.10 Restriction

¶ 48    The trial court addressed the section 603.10 restriction. Citing to *In re Marriage of Anderson*, 130 Ill. App. 3d 684, 688 (1985), it acknowledged that a section 603.10 restriction required a different, more onerous standard than the best interests of the child. Also, citing to *In re Marriage of Craig*, 326 Ill. App. 3d 1127, 1129 (2002), it acknowledged that allegedly immoral conduct by the parent was relevant only if it affects the child. With these standards in mind, it determined that a restriction was appropriate for Natasha. The court criticized Natasha's participation in the pornography industry, stating that it presented an undue risk to T.T.'s "mental, moral, and emotional health." It noted that, during the course of this case, Natasha has increased her involvement in the industry and now records activities with other people. The court questioned whether Natasha properly vetted her coparticipants, given that she knew one of her partners less than one year. It also questioned Natasha's ability to keep her work separate from T.T., citing many instances of erratic behavior, which we will address in further detail below. The court reasoned that "it is not realistic to think that [T.T.] will grow up unexposed and unaffected by the pornography being made by her mother, in her own home. *** This is especially true considering that Natasha's pornography is published on the internet, with her real name [which she shares with

T.T.].”

¶ 49   The trial court acknowledged that this was a nuanced situation in that Francesco "has also participated in behavior that *** negatively impact[ed] [T.T.'s] well-being." The court noted that Natasha's testimony that Francesco had committed acts of domestic violence against her was, overall, "credible," and that Francesco has tested positive for cocaine during the course of this case. The court recounted that Francesco had testified that, while at a friend's house in the fall of 2020, he did one line of cocaine. The court determined, however, that Francesco's participation in harmful activities had *ended* whereas Natasha's participation in harmful activities *continued*: "[T]here is no evidence that [T.T.] will be exposed to domestic violence or drug use [in Francesco's] household going forward. In contrast, Natasha is continuing with pornography as her line of work." The court reasoned that supervised visitation would both "protect [T.T.] from exposure to Natasha's work" *and* "ensure that [T.T.] will be returned to [Francesco] at the conclusion of Natasha's parenting time."

¶ 50                    2. The Remaining Best-Interest Factors

¶ 51   The trial court determined that the remaining best-interest factors weighed in favor of awarding Francesco the majority of the parenting responsibilities. It stressed that Francesco's household was more stable than Natasha's. It noted that Francesco worked from home, lived with his girlfriend, and had regular parenting time with his other children. Francesco was able to describe his parenting style, T.T.'s place within his home, and T.T.'s anticipated school and activities. In contrast, the court viewed Natasha's life as "erratic." Since T.T.'s birth, Natasha had moved between Miami, Las Vegas, Chicago, Seattle, and Woodstock. She sought opportunities to work as a server in the Bahamas. "Her behavior during this case has been similarly erratic." She has acted *pro se* while having counsel of record (both of whom later withdrew). She has filed

pleadings days after the entrance of an agreed order. She has obtained nearly $30,000 from a GoFundMe program, which had the stated purpose of raising money for legal fees. Yet, rather than appear with counsel for the instant proceedings, she paid $11,000 to counsel in Florida to investigate Francesco for a possible tax crime.

¶ 52    The trial court further stressed that Natasha had not demonstrated an ability to comply with court orders or to coparent. In the court's view, Natasha had "manipulat[ed] local law enforcement to try to remove [T.T.] from [Francesco's] care" and that the "[e]vidence demonstrates that, [if she becomes concerned for T.T.], she will take matters into her own hands and *** completely disregard court orders. At [two] years old, [T.T.] has no way of knowing or protesting if Natasha disobeys the court order." The court ordered that, with advance notice, Natasha would be permitted to have supervised parenting time up to two weekends per month, on both Saturday and Sunday, for up to 9 hours per visit (for a total of up to 36 hours per month). This timely appeal followed.

¶ 53                                   II. ANALYSIS

¶ 54    Natasha, *pro se*, appeals the trial court's decision to grant Francesco significant decision-making authority and the majority of parenting time and to grant Natasha only restricted parenting time. We may reverse a trial court's decision concerning the allocation of parental responsibilities only if it is against the manifest weight of the evidence. *In re Parentage of J.W.*, 2013 IL 114817, ¶ 55. A decision is against the manifest weight of the evidence when an opposite conclusion is clearly apparent or when the fact finder's finding appears to be arbitrary and unsubstantiated by the evidence. *Melamed v. Melamed*, 2016 IL App (1st) 141453, ¶ 37. When considering the evidence, we must be mindful that the trial court was in the superior position to judge witness credibility and that, if the evidence permits multiple inferences, we are to accept those inferences

that support the trial court's decision. *In re Marriage of Bates*, 212 Ill. 2d 489, 516 (2004). In this case, we must also be mindful that the record on appeal contains only a small portion of the hearing transcripts, and that "any doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984). For the reasons that follow, and particularly on this record, we affirm the trial court's allocation of parental responsibilities and its decision to restrict Natasha's visitation.

¶ 55    In determining how to allocate parental responsibilities, the trial court must consider the best-interest factors set forth in sections 602.5 (decision making) and 602.7 (parenting time). 750 ILCS 5/602.5(c), 602.7(b) (West 2020). The best-interest factors set forth under section 602.5(c) are:

> "(1) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to decision-making;
>
> (2) the child's adjustment to his or her home, school, and community;
>
> (3) the mental and physical health of all individuals involved;
>
> (4) the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making;
>
> (5) the level of each parent's participation in past significant decision-making with respect to the child;
>
> (6) any prior agreement or course of conduct between the parents relating to decision-making with respect to the child;
>
> (7) the wishes of the parents;
>
> (8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on decision-making is appropriate under Section 603.10;

(11) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(12) the physical violence or threat of physical violence by the child's parent directed against the child;

(13) the occurrence of abuse against the child or other member of the child's household;

(14) whether one of the parents is a sex offender, and if so, the exact nature of the offense and what, if any, treatment in which the parent has successfully participated; and

(15) any other factor that the court expressly finds to be relevant." 750 ILCS 5/602.5(c) (West 2020).

¶ 56   The best-interest factors set forth in section 602.7(b) largely overlap with those set forth in section 602.5(c). However, section 602.7(b) adds as factors the child's potential to interact with siblings and the willingness of each parent to place the needs of the child ahead of his or her own needs. 750 ILCS 5/602.7(b)(5), (b)(12) (West 2020).

¶ 57                          A. Section 603.10 Restriction

¶ 58   The question of whether a section 603.10 restriction is appropriate is a best-interest factor under both section 602.5 and 602.7, and, in this case, the question of whether Natasha's decision-making authority and parenting time should be restricted pursuant to section 603.10 was a central concern. We therefore begin our analysis by addressing that question. A restriction on parenting

time is appropriate if one parent's conduct has seriously endangered the child's mental, moral, or physical health. 750 ILCS 5/603.10 (West 2020). Analyzing similar language from prior versions of the Act, courts have determined that the question of endangerment encompasses not only present harm but also the potential for harm to the child within a given home environment. *In re Marriage of Padiak*, 101 Ill. App. 3d 306, 314 (1986). Indeed, the dictionary definition of "endanger" is "to put someone or something at risk or in danger of being harmed, damaged, or destroyed." See https://dictionary.cambridge.org/us/dictionary/english/endanger (last visited February 23, 2022). The party seeking the restriction has the burden to establish by a preponderance of the evidence that conduct has seriously endangered the child. 750 ILCS 6/603.10 (West 2020); *Anderson*, 130 Ill. App. 3d at 688. The question of serious endangerment is a different, more stringent standard than a simple question of the child's best interest. *Id*. If the court determines that a restriction is appropriate, then it must enter an order necessary to protect the child. *In re Marriage of Mayes*, 2018 IL App (4th) 180149, ¶ 5. The court may, when appropriate, order a reduction, elimination, or other alteration of parenting time, including ordering supervised visits. 750 ILCS 5/603.10(a)(1) (West 2020).

¶ 59    Natasha argues that the trial court erred in determining that a section 603.10 restriction was warranted. Natasha notes that a section 603.10 restriction requires a finding of serious endangerment. In Natasha's view, if this stringent standard had been met, then the trial court should not have had a "difficult" time in allocating parental responsibilities. ("Deciding which parent will have this role in T.T.'s life is difficult.") Natasha also argues that the trial court placed too much weight on her work in the pornography industry and that this was especially unfair where Francesco also partook in activities—domestic violence and drug use—that posed a risk to T.T.'s mental, moral, or physical health.

¶ 60    We determine that the evidence available to us supports the trial court's determination that restricted visits were warranted, and the trial court's single comment that the case was "difficult" does not undermine its determination. The trial court, citing to *Anderson*, 130 Ill. App. 3d at 688, recognized that issuing a section 603.10 restriction required a stringent standard. It expressly stated in its ruling that Natasha's work in the pornography industry presented an undue risk to T.T.'s "mental, moral, and emotional health." But it also recognized that alleged immoral conduct by a parent is not enough; rather, the alleged immoral conduct must affect the child. In this case, the court cited to the instability that Natasha's participation in the pornography and nightlife industries brought to T.T.'s life, as well as Natasha's inability to keep this part of her life separate from T.T.

¶ 61    While it is improper to presume harm based on a parent's alleged involvement in immoral activities, evidence bearing on the stability of the child's environment is "obviously relevant." *Craig*, 326 Ill. App. 3d at 1129. Here, the court found Natasha's lifestyle to be "erratic." In support, it noted the multiple cities in which she had lived since T.T.'s birth and her willingness to work occasional weekends in the Bahamas despite her stated desire to raise T.T. in Miami. The court's view of Natasha's lifestyle as erratic was further substantiated by her conduct in the instant case. As the trial court noted, Natasha frequently filed contrary motions just days after the entrance of an agreed order and declined to put funds donated for legal fees toward her custody case.

¶ 62    The trial court also doubted Natasha's ability to keep her work in the pornography industry separate from T.T. The court was troubled that Natasha conducted filming in the same two-bedroom apartment where T.T. was present. While Natasha testified that she had hired a babysitter during filming and that T.T. was not in the same room, the fact remained that Natasha invited at least two people, her photographer and filming partner who she had not known for a great length

of time, into the apartment. The court was further troubled by how easily Natasha invited people into her life given her experience in the New York case.

¶ 63    In addition, the trial court's decision to restrict parenting time was not due only to Natasha's participation in the pornography industry. The court also expressed great concern for Natasha's inability to follow court orders and the risk that Natasha would conceal T.T. from Francesco. In the fall of 2019, Natasha was granted permission via an agreed order to remove T.T. to Florida. Instead, she went to Las Vegas. In the fall of 2020, Natasha refused to return T.T. to Francesco, and Florida law enforcement had to remove T.T. Similarly, in the spring of 2021, Natasha used a Florida order of protection in an attempt to remove T.T. from Illinois, which was in express violation of the trial court's admonishment. Natasha admitted that, at times, she refused to disclose T.T.'s whereabouts to Francesco. The child representative had opined that, were Natasha to conceal T.T.'s whereabouts from Francesco for any length of time, it would "significantly impair" T.T.'s emotional well-being. The trial court reasonably agreed, noting in its order that supervised visitation would "ensure that [T.T.] will be returned to Francesco at the conclusion of Natasha's parenting time."

¶ 64    We also disagree that the trial court's decision to order Natasha to have restricted visitation was rendered unreasonable in light of Francesco's participation in harmful activities, such as domestic violence and drug use. The trial court specifically addressed these points. The court endorsed the child representative's view that Francesco and Natasha brought out the worst in each other. It stated that, while it found Natasha's allegations of abuse credible, it also found that Francesco's acts of domestic violence were unlikely to continue in the future. The evidence available in the record supports the trial court's reasoning. For example, as noted in the child-representative report, Francesco enjoyed a 10-year marriage with his now ex-wife, who presently

has no concerns about sharing custody with him. The court also listened to the testimony of Francesco, Francesco's ex-wife, and Francesco's current girlfriend and expressly determined that there was no risk that T.T. would be directly exposed to domestic violence. The record on appeal does not contain this testimony, but we must presume that this testimony supported the court's decision. *Foutch*, 99 Ill. 2d at 392. Additionally, the child representative's report stated that Francesco participated in drug treatment and inferred that Francesco was not presently using drugs. We must presume that the missing testimony further supported the child representative's inference that Francesco was not presently using drugs. *Id.*

¶ 65    Simply put, the trial court's 610.3 restrictions on Natasha's parenting time were not, as she argues, solely the function of the trial court's disapproving view of her participation in the pornography industry. Rather, acting in its role as factfinder, the trial court reasonably determined that Natasha's participation in the pornography industry, *together with* an unstable lifestyle, a history of defying court orders, and a demonstrated willingness to conceal T.T. from Francesco, warranted a section 603.10 restriction. We cannot say this conclusion was unreasonable.

¶ 66                     B. The Remaining Best-Interest Factors

¶ 67    We next address whether, in considering the remaining best-interest factors, the trial court's decision to allocate significant decision-making authority and the majority of the parenting to Francesco was against the manifest weight of the evidence. Here, again, Natasha argues that the trial court placed undue emphasis on her work in the pornography industry to the exclusion of the other factors. We disagree, and we determine that the trial court's 17-page written order demonstrates that it considered each of the applicable best-interest factors.

¶ 68    In particular, the trial court noted that, given the parties' contentious history and the physical distance between them, the majority of parental responsibilities would be awarded to one

party (factors 602.5(c)(4), 602.5(c)(9), and 602.7(b)(9)). The court then determined, reasonably, that Francesco was more likely to facilitate a coparenting relationship (factors 602.5(c)(11), 602.7(b)(13)) and to put T.T.'s needs above his own (factor 602.7(b)(12)). For example, the child representative's report stated that Francesco successfully facilitated T.T.'s visits with Natasha. Natasha, in contrast, missed three visits with T.T., twice confusing the dates. Although the third missed visit was due to the hospitalization of her father, she did not inform Francesco of the canceled visit in advance. Also, Natasha used donated legal funds to investigate a possible financial crime committed by Francesco rather than to obtain custody of T.T. The court was also free to determine any factor it found to be relevant (factors 602.5(c)(15) and 602.7(b)(17)), and it determined, reasonably, that Francesco's household provided T.T. with greater stability. Francesco worked from home, his live-in girlfriend helped with childcare, and he already provided for his two other children in the home. Francesco testified to his parenting philosophy and T.T.'s place in the existing family structure and, without the transcripts and in deference to the trial court, we must accept that this testimony supported the trial court's determination. *Foutch*, 99 Ill. 2d at 392. While Francesco's vile texts during the pendency of the litigation and his potential domestic violence preceding it are certainly of concern, we cannot say on balance that they rendered the trial court's best interest determination manifestly erroneous.

¶ 69     Finally, we address points raised in Natasha's supplementary reply brief. Natasha devotes much of her reply brief attempting to rebut allegations in Francesco's petition rather than challenging the trial court's decision. Also, citing to section 610.5 of the Act (750 ILCS 5/610.5 (West 2020)), she argues that Francesco was required to establish a substantial change in circumstances in order to modify the existing November 2019 agreed order allowing Natasha to remove T.T. to Florida. However, even accepting for the sake of analysis that the November 2019

agreed order was the status quo when the trial court entered the instant order, the question of a substantial change in circumstances does not apply to cases involving section 603.10 restrictions. *Id*.

¶ 70   In sum, this case presents a complicated and nuanced fact pattern, and we have not been provided with the entire record.  On the record that is before us, it is clear that the trial court did not restrict Natasha's parenting time and require supervised visitation solely because she participated in the pornography industry, but also because she had a demonstrated history of failing to comply with court orders, overtly disobeying court orders, and concealing T.T.  The trial court, after reviewing the child representative's report and listening to the testimony of Francesco and others in his life, determined that there was no risk of domestic violence in his current household and that Francesco would continue to facilitate restricted visitation with Natasha.  As such, its decision to award Francesco significant decision-making authority and the majority of the parenting time and to restrict Natasha's visitation was not against the manifest weight of the evidence.

¶ 71                                III. CONCLUSION

¶ 72   For the aforementioned reasons, we affirm the judgment of the trial court.

¶ 73   Affirmed.